UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
_____
                                    )
HENRY ROSCITI, DONNA ROSCITI,       )
HENRY ROSCITI, JR.,                 )
        Plaintiffs,                 )
                                    )
    vs.                             )    C.A. No. 09-338 S
                                    )
LIBERTY MUTUAL INSURANCE COMPANY,   )
LIBERTY NORTHWEST INSURANCE CORP.,  )
JOHN DOE INSURANCE COMPANY, and     )
THE INSURANCE COMPANY OF THE STATE  )
OF PENNSYLVANIA as insurers of      )
MONACO COACH CORPORATION,           )
                  Defendants.       )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

    This diversity action arises out of negligence and products liability claims that Plaintiffs assert against Monaco Coach Corporation ("Monaco"), which is currently in Chapter 7 bankruptcy. Plaintiffs proceed pursuant to Rhode Island's so-called "direct action" statute, R.I. Gen. Laws 1956, § 27-7-2.4 (2010), which allows tort victims to recover damages directly from liability insurers of a bankrupt tortfeasor. Defendant Insurance Company of the State of Pennsylvania ("ICSOP"), which provided Monaco with excess insurance at relevant times, has moved for summary judgment. ICSOP contends that Monaco has not met a prerequisite to coverage under its excess insurance policies, and therefore that Plaintiffs cannot recover from

ICSOP.   Specifically, Monaco is self-insured up to a $500,000 retained limit, and, according to ICSOP, must exhaust that limit before ICSOP becomes liable.   The parties agree that will not happen, because Monaco is insolvent.

At the heart of the dispute is this question: does § 27-7-2.4 effectively nullify the retained limit exhaustion requirement in ICSOP's policies because Monaco is bankrupt?   For the reasons explained below, the Court concludes that it does not, and that Defendant's motion must therefore be granted.

I.   Background

Plaintiffs allege that Monaco sold them a defective mobile home and then failed to repair it.   As a result, the vehicle leaked, allegedly causing one of the Plaintiffs to suffer health problems because of toxic mold.   (See Am. Compl. ¶¶ 7-16.) Plaintiffs assert claims of negligence, breach of warranty, and strict products liability against Monaco.   (See id. ¶¶ 21-39.)

Because Monaco is now bankrupt, Plaintiffs have named as Defendants Monaco's insurers, including ICSOP.   Plaintiffs argue ICSOP is liable to them pursuant to § 27-7-2.4, which provides:

> Any person, having a claim because of damages of any kind caused by the tort of any other person, may file a complaint directly against the liability insurer of the alleged tortfeasor seeking compensation by way of a judgment for money damages whenever the alleged tortfeasor files for bankruptcy, involving a chapter 7 liquidation, a chapter 11 reorganization for the benefit of creditors or a chapter 13 wage earner plan, provided that the complaining party shall not recover

an amount in excess of the insurance coverage available for the tort complained of.

R.I. Gen. Laws § 27-7-2.4.

The conflict here springs from the fact that ICSOP is not Monaco's primary insurer. Instead, it provided excess insurance for Monaco, covering claims above $500,000 up to limits ranging from $1.5 to $2.5 million, depending on the policy. For the primary layer of liability coverage, up to $500,000, Monaco is self-insured. (See Defendant's Statement of Undisputed Facts ¶ 14, ECF No. 13, May 20, 2010 (hereinafter "Def.'s Facts").) ICSOP asserts that each of the excess insurance policies issued to Monaco require it to pay out that full amount before it can obtain any coverage from ICSOP, even for claims above $500,000. Yet, Monaco has not paid any portion of Plaintiffs' claims, and is protected from liability under bankruptcy rules.

As a result of Monaco's failure to pay its retained limit, ICSOP insists that it can have no liability to Monaco. And that, in turn, means there is no "insurance coverage available" under the ICSOP policies against which Plaintiffs can recover pursuant to § 27-7-2.4, according to ICSOP. See R.I. Gen. Laws § 27-7-2.4. That is, because Monaco is not entitled to excess insurance from ICSOP, ICSOP concludes that § 27-7-2.4 allows no direct action against ICSOP based on Monaco's negligence.

Plaintiffs do not dispute any of ICSOP's alleged facts. Instead, they argue that the terms of the contracts, and of § 27-7-2.4, allow them to recover any damages above $500,000 directly from ICSOP, even though Monaco cannot pay that retained limit. Thus, the outcome of this controversy turns on what the terms of the excess policies mean, and whether the direct action statute overrides any of them.

## II. Discussion

To decide ICSOP's motion, the Court must answer two questions. First, do the excess policies allow Plaintiffs to tap into ICSOP's excess coverage for Monaco, even though Monaco cannot pay its retained limit? And, second, if they do not, does § 27-7-2.4 supersede that result? Because, for the reasons explained below, the answer to both questions is no, ICSOP is entitled to summary judgment.

### A.  Terms of the excess policies

ICSOP points to two provisions in each of the excess policies that, it argues, rule out coverage for Monaco's liability to Plaintiffs. First, the policies state that ICSOP agreed as follows: "We shall pay you [Monaco], on your behalf, the ultimate net loss, in excess of your retained limit, that you become legally obligated to pay . . . ." (Excess Policies, section I.A.1, Exs. 1-5 to Affidavit of Karen Spencer, ECF No. 14, Apr. 13, 2010 (hereinafter "Spencer Aff."); see Def.'s Facts

¶ 2.)  The "retained limit" is an agreed-upon dollar amount that may be satisfied by "a self-insured retention, underlying insurance, or a combination thereof." (Excess Policies, section II.EE, Exs. 1-5 of Spencer Aff.)  In this case, the "retained limit" refers to Monaco's $500,000 self-insured retention.  (See Def.'s Facts ¶ 14.)

Second, section III.C of the policies provides:

> Our duty to pay any sums that you [Monaco] become legally obligated to pay arises only after there has been a complete expenditure of your retained limit(s) by means of payments for judgments, settlements, or defense costs.

(Excess Policies section III.C, Exs. 1-5 to Spencer Aff.)  It is uncontested that Monaco has not exhausted its $500,000 limit, and that it will not be able to pay that amount.

Plaintiffs, however, say the policies actually drop the exhaustion requirement in the event of Monaco's bankruptcy. They cite section VI.D:

> Your bankruptcy, insolvency or inability to pay, or the bankruptcy, insolvency or inability to pay of any of your underlying insurers shall not relieve us from the payment of any claim covered by this Policy.
> But under no circumstances shall the bankruptcy, insolvency, or inability to pay require us to drop down or in any way replace your retained limit or assume any obligation associated with your retained limit.

(Excess Policies section VI.D, Exs. 1-5 to Spencer Aff.) Plaintiffs concede that they cannot ask ICSOP to "drop down" to pay the first $500,000 of Monaco's liability, or "replace" the

retained limit.  Yet, they highlight the instruction in section
VI.D that Monaco's bankruptcy "shall not relieve" ICSOP from
paying covered claims.  Therefore, Plaintiffs assert, ICSOP must
pay any damages above $500,000, because the reason Monaco cannot
honor its retained limit is insolvency.  In other words,
Monaco's bankruptcy triggers section VI.D, which trumps the
exhaustion prerequisite in section III.C.

      B.   Do the policies require exhaustion even if the insured
           is bankrupt?

Both sides agree the policies are governed by Rhode Island
law, which provides that if the terms of an insurance policy are
"clear and unambiguous, judicial construction is eclipsed and
the contract must be applied as written." Aetna Cas. & Sur. Co.
v. Sullivan, 633 A.2d 684, 686 (R.I. 1993).  In that event, the
Court cannot "deviate from literal policy language." Town of
Cumberland v. R.I. Interlocal Risk Mgmt. Trust, Inc., 860 A.2d
1210, 1215 (R.I. 2004).

Alternatively, if the policies are ambiguous, they must be
read in the light most favorable to Plaintiffs.  The rule of
contra proferentum, which means "against the drafter," requires
a court to "construe ambiguous terms in an insurance contract in
favor of the insured." Open Software Found., Inc. v. U.S.
Fidelity & Guar. Co., 307 F.3d 11, 17 (1st Cir. 2002); see
Zifcak v. Monroe, 249 A.2d 893, 896 (R.I. 1969) ("[I]f the terms

of an agreement are doubtful and uncertain, they shall be construed most strongly against the author thereof."); accord Lifespan/Physicians Prof'l Servs. Org., Inc. v. Combined Ins. Co. of Am., 345 F. Supp. 2d 214, 222 (D.R.I. 2004) (denying summary judgment to insurer and applying contra proferentum where language was ambiguous).  "An ambiguity occurs only when the contract term is reasonably and clearly susceptible of more than one interpretation."  Merrimack Mut. Fire Ins. Co. v. Dufault, 958 A.2d 620, 625 (R.I. 2008) (citation and internal quotation marks omitted).

According to Plaintiffs, the contracts are ambiguous, because Plaintiffs' interpretation is just as reasonable as ICSOP's contrasting view.  Monaco cannot pay its first $500,000 of self-insured liability, because it is insolvent and protected by the rules of bankruptcy.  Therefore, Plaintiffs declare, the "complete expenditure" requirement in section III.C cannot apply in this instance.  (Excess Policies section III.C, Exs. 1-5 to Spencer Aff.)  If it did, they reason, that would have the effect of allowing bankruptcy to "relieve" ICSOP from the coverage it promised, in violation of section VI.D.

Put differently, Plaintiffs believe sections III.C and VI.D clash with one another, leaving no conclusion but that the contracts are inherently ambiguous.  Cf. Nat'l Fire & Marine Ins. Co. v. Adoreable Promotions, Inc., 451 F. Supp. 2d 1301,

1307 (M.D. Fla. 2006) ("A provision in a contract is ambiguous if it irreconcilably conflicts with another provision, or when it is equally susceptible to more than a single meaning.") (applying Michigan law). Because the Court cannot apply both provisions at once, <u>contra</u> <u>proferentum</u> obligates it to choose the one that favors Plaintiffs, they assert.

There is a certain appeal to the result Plaintiffs' suggest, which seems fair on an equitable level. However, on closer examination, their interpretation of the agreements does not hold up. To begin with, Plaintiffs' argument stumbles over two parts of the bankruptcy clause that they downplay. First, section VI.D specifies that the bankruptcy of the insured shall not relieve ICSOP from paying "any claim covered by" the policies. (Excess Policies section VI.D, Exs. 1-5 to Spencer Aff.) A straightforward interpretation of the reference to "covered" claims is that it incorporates the exclusions and limitations stated elsewhere in the contracts, including the exhaustion prerequisite. Thus, if that prerequisite has not been met, there is no claim "covered by" the policies. Accordingly, ICSOP would have no duty to pay, even if the insured were bankrupt.

Second, to drive the point home, the next sentence in the clause provides: "under no circumstances shall the bankruptcy, insolvency, or inability to pay require us to drop down or in

any way replace your retained limit or assume any obligation associated with your retained limit." (Id.) This calls particular attention to rules governing "retained limits" contained elsewhere in the contracts. It cautions that those rules do not change, according to ICSOP. That is a convincing explanation, especially in light of the reminder that ICSOP's duty is limited to "covered" claims. Read in this manner, section VI.D reaffirms section III.C, which proclaims that ICSOP's "duty to pay . . . arises only after there has been a complete expenditure of . . . retained limit(s)." (Id. section III.C.) If that is true, the insured's bankruptcy does not take away the exhaustion rule, but rather preserves it.

Plaintiffs point out that section VI.D does not actually mention "complete expenditure" of the retained limit. Therefore, they insist, even if it leaves the amount of that limit unchanged, it should not be read to shelter the exhaustion requirement too. Following Plaintiffs' logic, the second sentence in section VI.D means only that ICSOP's coverage still starts at $500,001, even though Monaco is bankrupt; ICSOP never has to pay the first $500,000 of liability. But, Plaintiffs profess, Monaco's insolvency does require ICSOP to start paying claims over and above that amount before Monaco forks over all the primary coverage.

The problem with this view is that it leaves no way to make all the contract terms work together.  Accepting Plaintiffs' interpretation would mean that the "complete expenditure" language in section III.C must disappear in the event of the insured's bankruptcy.  Yet, the Court should not labor to "read ambiguity into a policy where none is present."  Town of Cumberland, 860 A.2d at 1215 (quoting Pawtucket Mut. Ins. Co. v. Gay, 786 A.2d 383, 386 (R.I. 2001)).  On the contrary, it must strive to make sense of the "instrument as a whole."  Colonial Penn. Ins. Co. v. Mendozzi, 488 A.2d 734, 736 (R.I. 1985).

Despite what Plaintiffs claim, there is no "irreconcilabl[e] conflict" between the "complete expenditure" rule and the preservation of coverage during bankruptcy.  Nat'l Fire & Marine, 451 F. Supp. 2d at 1307.  To be sure, sections III.C and VI.D might be "irreconcilable" if, as a practical matter, insolvency always made it impossible to exhaust the retained limit.  But that is not the case.  Under any number of scenarios, the insolvency contemplated in section VI.D might not prevent exhaustion.

For instance, if a bankrupt policyholder is not self-insured, but instead has a primary insurance policy, the primary carrier would be able to pay the retained limit in full.  Similarly, if it is the primary insurer, instead of the insured, that goes bankrupt — another possibility envisioned by section

VI.D, which refers to the insolvency of "underlying insurers" (see Excess Policies Section VI.D, Exs. 1-5 to Spencer Aff.) — the policyholder itself might end up having to cover a judgment up to the retained limit. And one can envision other parties to the action stepping in to fulfill the exhaustion rule as a way of bringing the excess insurer into play for settlement purposes. In each of these scenarios, bankruptcy would not preclude excess coverage under ICSOP's policies.

Of course, there is no primary insurer in this case, and no other source is available to pay the retained limit. But, as Plaintiffs conceded at oral argument, it is not inconceivable that a policyholder could be both self-insured at the primary level and insolvent, yet still manage to unlock excess coverage. For example, the very satisfaction of a retained limit might send the policyholder into bankruptcy. Alternatively, a bankrupt policyholder might pay tort claims pursuant to discharge from chapter 11 reorganization. Even if the claims were paid at a discount, the retained limit could be fully exhausted, because the claims may have exceeded the limit to begin with.

The point is that it is not a foregone conclusion that the bottom layer of coverage can never be exhausted if the insured is bankrupt. Exhaustion may be impossible in the majority of bankruptcies involving policyholders with self-insured

11

retentions, and both parties agree that it cannot happen here. However, it is not just a mirage.

This discussion demonstrates that the bankruptcy clause and the exhaustion clause do not inevitably collide, but rather may work in tandem.[1]  As a result, Monaco must completely expend its retained limit before ICSOP can be liable to Plaintiffs.  Since Monaco has not done so, and will not be able to, the contracts do not allow Plaintiffs to recover from ICSOP.

C.  Does § 27-7-2.4 alter the policies?

Having concluded that the excess policies do require exhaustion of the underlying limit before ICSOP becomes liable, the Court now turns to the more critical question: does § 27-7-

---

[1] What is the point, one might ask, of the statement that bankruptcy does "not relieve" ICSOP of the duty to pay claims, if not to relax the "complete expenditure" requirement in the event of bankruptcy?  One answer is that it provides assurance that ICSOP will not try to hide behind bankruptcy rules designed to protect debtors.  Bankruptcy stays all claims against a debtor upon filing, and unsecured claims may be extinguished upon discharge.  See 11 U.S.C. § 362(c)(1) (imposing automatic stay as of time of filing for bankruptcy); SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin), 530 F.3d 230, 235 (3rd Cir. 2008) (noting that "bankruptcy discharge extinguishes . . . in personam claims against the debtor(s)").  That the bankruptcy clause might be redundant with case law recognizing the need to preserve creditors' claims against a bankrupt debtor's insurers after discharge is not a reason that the clause must mean something different.  See D'Amico v. Johnston Partners, 866 A.2d 1222, 1228 (R.I. 2005) ("[I]t is generally agreed that the debtor's discharge does not affect the liability of the debtor's insurer for damages caused by the debtor and that the creditor may seek to recover from the insurer.") (quotation marks, alterations, and citation omitted).  It is common for contract boilerplate to regurgitate case law.

2.4 modify the policy terms?   More specifically, does it bulldoze the exhaustion prerequisite because Monaco is bankrupt? For the reasons fully explained below, the statute cannot achieve that result.

Section 27-7-2.4 allows a tort plaintiff to "file a complaint directly against the liability insurer of the alleged tortfeasor seeking compensation by way of a judgment for money damages whenever the alleged tortfeasor files for bankruptcy." R.I. Gen. Laws § 27-7-2.4.  However, the statute warns that "the complaining party shall not recover an amount in excess of the insurance coverage available for the tort complained of." Id.

ICSOP advocates for an expansive construction of the "coverage available" caveat.   Its effect, ICSOP proposes, is that any limitations on coverage in the insurance contract, such as an exhaustion prerequisite, also control the plaintiff's right to recovery pursuant to § 27-7-2.4.   In other words, if ICSOP is correct, a § 27-7-2.4 plaintiff steps into the shoes of the insured, and must clear whatever hurdles to payment the insured would face when filing a claim under the policy.

On the other end of the spectrum, the word "amount" could indicate that "coverage available" solely refers to the dollar limits stated in any policies.   In that case, the caveat would mean only that the insurer's liability cannot exceed those limits, even if the plaintiff proves greater damages.   It would

therefore suggest that the statute negates other policy limitations, such as an exhaustion clause.

The truth must lie between those two extremes. If § 27-7-2.4 restricted insurers' defenses to relying on the dollar amounts of policy limits, it would essentially create strict liability once the plaintiff proved damages. An insurer could never object, for example, that its policy was not in effect when the tort occurred, or that the insured did not provide notice of a claim within the period stated by the contract. In effect, all the words in the policy would vanish, leaving only a cap on damages, and thus no preconditions to coverage except the plaintiff's burden of proof on the tort claim. There is no reason to assume the statute works that way. And the other side of the coin is that the "coverage available" language cannot be an invitation to draft exclusions designed to defeat § 27-7-2.4. For instance, a clause that stated, "ICSOP is not subject to suit under direct action statutes," or that had the effect of immunizing ICSOP from such claims, would be invalid in Rhode Island.

To hone in on the effect of the statute in this case, it is tempting to turn to principles of statutory interpretation. However, they offer limited help, because each side can point to a legitimate doctrine that supports its argument. On one hand, Plaintiffs ask the Court to "give effect to the legislative

purpose behind § 27-7-2.4, which is to give an aggrieved and injured party the right to proceed directly against an insurer in those circumstances in which the tortfeasor has sought protection under the applicable provisions of the United States Bankruptcy Code." D'Amico v. Johnston Partners, 866 A.2d 1222, 1229 (R.I. 2005). That would counsel reading the statute broadly (and thus giving a narrow effect to the "coverage available" caveat). On the other hand, ICSOP reminds the Court that common law did not provide tort plaintiffs with a direct remedy against the tortfeasor's insurer. The Rhode Island Supreme Court follows a "well-established rule that statutes that abrogate the common law must be strictly construed." Esposito v. O'Hair, 886 A.2d 1197, 1203 (R.I. 2005). That would counsel reading § 27-7-2.4 narrowly (and thus widening the caveat).[2]

Ultimately, while the Court empathizes with Plaintiffs, it cannot see how the statute might effectively void the exhaustion clause in the contracts. For one thing, section III.C is not the functional equivalent of a grab for immunity from laws like § 27-7-2.4. This is because, as discussed above, the "complete

---

[2] Cf. Werner Enters., Inc. v. Stanton, 690 S.E.2d 623, 624-25 (Ga. Ct. App. 2010) (holding that "an excess policy is not subject to suit under [Georgia's] direct action statute," which only applied to primary insurance policies, and observing that "the direct action statute is in derogation of the common law, [and] the terms of that statute must be strictly construed") (citation omitted).

expenditure" provision does not raise an insurmountable barrier to recovery for direct action plaintiffs.   It is thus not the case that section III.C is designed to thwart § 27-7-2.4, which would mean that the two could not coexist.

Failing that, the Court perceives no hook in the statutory language that could pull the exhaustion clause out of the contracts.   Section 27-7-2.4 does not mention policy terms that deal with exhaustion or retained limits, and the announcement that a plaintiff "may file a complaint" against a liability insurer simply does not address such requirements.   R.I. Gen. Laws § 27-7-2.4.   Even if the statute should be read broadly, it contains nothing that could be construed to target section III.C.   The Court is therefore not persuaded that it should be demolished.   To put it another way, the "coverage available" caveat must, at a minimum, be ample enough to leave the exhaustion provision in place, because no other language in § 27-7-2.4 shoves it aside.

A close examination of the relief Plaintiffs seek buttresses this conclusion.   Plaintiffs claim that ICSOP need not "drop down" to cover the first $500,000 of Monaco's retained limit.   But as a practical matter, that is exactly what could occur if Plaintiffs succeed, depending on the damages they can prove.   Two examples serve to make the point.   Suppose, for instance, that Plaintiffs obtained a jury verdict of $1 million.

In that case, it would not matter that ICSOP's $500,000 of liability would technically be categorized as "excess insurance" under the policies. That label would belie the economic reality, which is that ICSOP's payment would be the first $500,000 secured by Plaintiffs. After all, they would use it to cover their first $500,000 of expenses. From ICSOP's perspective, since Monaco neither defended the lawsuit nor paid the primary limit, the situation would be no different than if ICSOP had been the primary insurer and Plaintiffs had only proven $500,000 in damages.

Such an outcome would contradict the general rule for the availability of excess insurance when the policyholder is bankrupt. While the Rhode Island Supreme Court has not spoken directly to this issue, ICSOP cites authority from outside Rhode Island that explains the standard approach:

> [A] true excess or secondary policy is not "triggered" or required to pay until the underlying primary coverage has been exhausted. This remains true even where the primary insurer would have paid to exhaustion but for its bankruptcy: in Pennsylvania, an excess insurer is not required to "drop down" to provide primary coverage if the underlying primary insurer is insolvent.

Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1454 (3d Cir. 1996) (internal citations omitted); see Associated Elec. & Gas Ins. Servs. Ltd. v. Border Steel Rolling Mills, Inc., No. EP-04-CV-389-KC, 2005 WL 3068787, at *9 (W.D. Tex. Sept. 27 ,

2005) ("[Defendant] has been declared an insolvent corporation and would therefore be unable to satisfy the underlying limits . . . . Hence, in the event a judgment is awarded against [Defendant], [the] excess insurance policy will not be triggered under the plain meaning of the policy terms."). These cases did not involve claims under a direct action statute, and are thus not precisely on point; however, they do demonstrate that courts enforce exhaustion clauses even when the policyholder is bankrupt.[3]

This approach makes sense, ICSOP argues, because the exhaustion prerequisite is critical to underwriting excess insurance. Exhaustion is no doubt built into the premiums ICSOP charges. ICSOP, it represents, assumes that whoever owns the bottom layer of risk will take charge of defending claims, and attempting to settle them. See generally Hartford Acc. & Indem. Co. v. Cont'l Nat'l Am. Ins. Cos., 861 F.2d 1184, 1187 (9th Cir. 1988) ("[A]n excess insurer predicates the premiums it charges upon the obligations that it and the primary insurer assume,

---

[3] Plaintiffs argue that the exhaustion rule in Rhode Island is not absolute. However, the case they cite only says that whether there is an exhaustion prerequisite depends on the terms of the contract. See Ins. Co. of N. Am. v. Kayser-Roth Corp., 770 A.2d 403, 418 (R.I. 2001) ("[C]overage existed under the policy regardless of the . . .exhaustion [] of the underlying insurance. Therefore, evidence of exhaustion would be irrelevant."). Since there is no question that the excess policies in this case do impose an exhaustion rule, Kayser-Roth is not helpful here.

including the primary insurer's obligation to defend all suits until exhaustion of its liability limits.").

That assumption reveals a second way in which Plaintiffs' interpretation would effectively cause a drop down. Suppose they claimed damages of $750,000. If ICSOP could be held responsible for the $250,000 in excess of the $500,000 retained limit pursuant to § 27-7-2.4, and that $500,000 is effectively zero, then ICSOP is the only source of funds at the settlement table. It is almost certain that ICSOP would need to pay more to settle the suit if forced to defend a direct action jury trial, with no primary insurance available, than it would have otherwise. This, again, is built into the cost of providing excess insurance with a primary layer of $500,000. If excess insurers knew they faced the possibility of dropping down in the context of bankruptcy, they would charge higher premiums for bearing that risk. So, if the Court held that an exhaustion clause violates § 27-7-2.4 where a bankrupt policyholder is self-insured for the retained limit, the net effect would be to reverse the existing contractual allocation of risk.

Plaintiffs' contention thus strains the language of § 27-7-2.4 too much. There is no question, of course, that the Rhode Island General Assembly could legislatively constrain insurers' use of such exhaustion clauses if it wished to do so. But the statute as currently worded does not do that, because it

mentions nothing about exhaustion.  And it is not for this Court to rewrite the law to achieve a more equitable outcome.[4]

In sum, the Court finds that because Monaco has not exhausted its retained limit, there is no "coverage available" for Plaintiffs under ICSOP's excess insurance policies.  R.I. Gen. Laws § 27-7-2.4.  And since Plaintiffs fail to prove that § 27-7-2.4 requires the Court to disregard the exhaustion clause, ICSOP is entitled to summary judgment.[5]

---

[4] If the General Assembly had wanted to restrict exhaustion provisions, it might have written, "where the tortfeasor is covered by excess insurance, exhaustion of the primary insurance shall not be a prerequisite to the excess insurer's liability to the plaintiff."  As an alternative, it could have proclaimed that, "if the tortfeasor's bankruptcy prevents the satisfaction of any precondition to coverage under the applicable insurance policy, that precondition shall be null and void."  Even more broadly, the General Assembly might have declared that "insurers shall be liable to plaintiffs to the extent of the damages proven notwithstanding any terms, conditions, and limitations in the applicable policies."

[5] Because the Court accepts ICSOP's broad argument that coverage under the excess policies has not attached, it need not address the narrower issue of whether the policies require dismissing Plaintiffs' product liability and breach of warranty claims because they exclude coverage for property damage.  In any event, Plaintiffs conceded that those claims would have to be dismissed even if they could overcome the exhaustion requirement.

III. Conclusion

For the foregoing reasons, ICSOP's motion for summary judgment is GRANTED and Plaintiffs' claims against ICSOP are dismissed.

IT IS SO ORDERED.


*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  August 30, 2010